**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| Timothy B. Williams, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services, LLC | ) | **COMPLAINT** |
| and PennyMac Loan Services, LLC, | ) | **WITH JURY TRIAL DEMAND** |
| | ) | |
| Defendants. | ) | |

**PRELIMINARY STATEMENT**

1.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.     Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum

1

possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.      Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.      Defendants compile, maintain, and report information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of

insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5.     This action for damages is based on Defendants' false reporting on Plaintiff's credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

6.     Plaintiff, Timothy B. Williams, is a natural person who resides in Floyd County, Georgia.

7.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3

8.     Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability company formed under the laws of the State of Georgia and registered to do business in the State of Georgia. Equifax may be served with process via its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

10.     Defendant, PennyMac Loan Services, LLC (hereinafter "PennyMac") is a limited liability company formed under the laws of the State of California and registered to do business in the State of Georgia. PennyMac may be served with process via its registered agent, C T Corporation System 289 S Culver St, Lawrenceville, GA, 30046-4805.

11.     PennyMac regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

13.    This Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

14.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

15.    Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

16.    Plaintiff took out a mortgage with Homestar Financial Corp. in May of 2017 in the amount of $89,292.00 (the "Mortgage").

17.    Ultimately the Mortgage was assigned to PennyMac.

18.    On or about September of 2023, Plaintiff obtained a copy of his consumer report as published by Equifax.

19.    That report contained erroneous information as provided by PennyMac, and as published and reported by Equifax.

20.    The relevant portion of the PennyMac tradeline appeared in the February 2023 Equifax report showing that Plaintiff's Mortgage with PennyMac had a balance of $0 and a monthly payment of $0.

21.    The fact that Plaintiff's Mortgage did not have a balance of $0 was objectively and readily verifiable as false.

22.    The fact that Plaintiff's Mortgage did not have a monthly payment of $0 was objectively and readily verifiable as false.

23.    In a letter dated February 12, 2024, Plaintiff disputed the inaccurate and misleading information directly to Equifax.

24.    Plaintiff's dispute letter stated that his balance was not $0.

25.    Plaintiff's dispute letter stated that his monthly payment was not $0.

26.    Plaintiff provided supporting documentation to show that his monthly payment and balance were not $0.

27.     Plaintiff's dispute letter did not ask or require the Defendants to make a legal determination about the balance or monthly payment of the Mortgage.

28.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify PennyMac of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for PennyMac's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

29.     Upon information and belief, Equifax timely notified PennyMac of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

30.     Alternatively, Equifax failed to notify PennyMac of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

31.     Equifax did not respond to Plaintiff's dispute.

32.     Plaintiff accessed his Equifax credit report again in April of 2024 and it contained the same errors which Plaintiff had previously disputed.

33.     Defendants' post-investigation reporting is, independently and jointly, false and misleading.

7

34.     Defendants' post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

35.     There is no indication in the tradeline that Plaintiff has disputed the information reported and published by Defendants, and the failure to note Plaintiff's legitimate dispute of the PennyMac tradeline renders the reporting materially misleading.

36.     Plaintiff is informed and believes that the revised tradeline reflects any information provided by PennyMac to Equifax in response to Plaintiff's dispute.

37.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

38.    15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

39.    As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

40.    As an integral aspect of its duties under the FCRA, PennyMac is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

*The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

41.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

42.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

43.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed December 12, 2023).

44.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

45.     The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

46.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

47.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed February 19, 2024).

48.     Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

49.     Equifax requires data furnishers that report to Equifax to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and

Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams*

(last accessed December 12, 2023).

50.    Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

51.    But for Defendants' failure to correct the information about the account, Plaintiff's credit report would have contained accurate information.

**INJURIES-IN-FACT**

**Effect of Consumer Reports Which Contain
Inaccurate or Misleading Information**

52.    Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

> > i.     credit or insurance to be used primarily for personal, family, or household purposes;

> > ii.    employment purposes; or

12

> iii.    any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

53.    The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

54.    The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

a.    Eligibility for and terms for credit;

b.    Potential for refinancing of existing credit;

c.    Eligibility for leasing prospects;

d.    Eligibility for utility services;

e.    Eligibility for and the terms of insurance;

f.    Employment or potential employment;

g.    Accounts which are under collection or review;

h.    Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

13

      i.      Standing with potential investors or servicers; and

      j.      Eligibility for individually-billed travel charge cards used by executive departments and agencies.

55.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

56.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf*, archived at* https://perma.cc/DCY4-ZS6C (last accessed on December 12, 2023).

57.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-

accurate-credit-transactions-act-2003-fifth-interim-federal-trade-

commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last

accessed on December 12, 2023).

58.    The FTC study found that not only do these errors adversely affect

consumers' credit scores, but the estimated proportion of reports and consumers who

experience a positive credit score change resulting from the *correction* of these

errors is higher than previous estimates from the credit reporting industry. *Id.*

<u>*Credit Scoring*</u>

59.    The Fair Isaac Corporation credit risk scoring system, commonly

referred to as "FICO", is the leading credit scoring system and utilizes data reported

by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-

scores/ (last accessed on December 12, 2023).

60.    The Fair Isaac Corporation uses the data in consumer reports to

calculate consumers' credit scores (also known as credit risk scores). *Id.*

61.    The term "credit score" is a numerical value or a categorization derived

from a statistical tool or modeling system used by a person who makes or arranges

a loan to predict the likelihood of certain credit behaviors, including default.

Consumer Financial Protection Bureau, *Supervision and Examination Manual,*

*Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on December 12, 2022).

62.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed December 12, 2023).

63.    Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and

any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed December 12, 2023).

64.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

65.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

66.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

67. Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report*/, archived at* https://perma.cc/9TQN-S5WP (last accessed December 12, 2022).

68. Defendants' actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer report.

69. The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

70. Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

71. The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than he otherwise would.

72.     Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third*

*Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

73.    Defendants' actions and omissions have caused Plaintiff's credit report to falsely indicate that Plaintiff's Mortgage had a balance of $0 and a monthly payment of $0.

74.    This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's Equifax credit report engaged in judgment-based lending.

75.    Plaintiff's correct payment history would be included in Plaintiff's Equifax credit report if Defendants had conducted appropriate investigations of Plaintiff's disputes.

76.     However, because the account is falsely reported in Plaintiff's Equifax credit report, Plaintiff will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating his payment history to a potential lender.

77.     This requires Plaintiff to expend more time, effort, and money due to Defendants' failures to abide by their obligations under the FCRA.

## DAMAGES

### Actual Damages

78.     As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages.

79.     These damages include out-of-pocket expenses incurred as a result of Defendants' wrongful representations regarding the account, and Defendants' failures to abide by their obligations under the FCRA.

80.     Plaintiff has suffered a decrease in Plaintiff's credit score as a result of Defendants' wrongful representations regarding the account, and Defendants' failures to abide by their obligations under the FCRA.

81.     Plaintiff has also experienced physical symptoms of aggravation, frustration, and stress due to the actions of Defendants.

### Statutory and Punitive Damages

82.    At the time Defendants reported the information at issue in this matter, each Defendant had actual notice that the information it was reporting regarding Plaintiff and the account was false, deceptive, and misleading.

83.    Plaintiff is informed and believe that PennyMac has previously provided Equifax with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax on notice of PennyMac's unreliability, and deficiencies in PennyMac's systems and procedures, which have repeatedly caused these errors to propagate in data provided by PennyMac and elude correction upon dispute by consumers.

84.    Each Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

85.    Despite that, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiff.

86.    Each Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

87.    Accordingly, Defendants' conduct was willful.

22

88.    As a result of Defendants' willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. §§ 1681e(b) and 1681i
## Equifax Information Services, LLC

89.    Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

90.    Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

91.    Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

92.    Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's dispute to PennyMac, including the forwarding of any documents provided by Plaintiff in support of that dispute.

93.    A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

94.    A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

95.    The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

96.    In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

97.    Plaintiff's dispute were clear and unambiguous as to the inaccuracies of Equifax's reporting.

98.    Plaintiff provided all the relevant information necessary for Equifax to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

99.    Equifax breached its duties as described herein.

100.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, Equifax would have reviewed and considered all of the information Plaintiff

submitted in his dispute, and would have easily detected that what was being reported regarding the account was factually incorrect, inaccurate, and misleading.

101.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, the PennyMac tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

102.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

103.   Equifax had all the information necessary to correct its reporting. Despite that, Equifax failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Equifax's reinvestigation procedures were not reasonable.

104.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

105.   Upon information and belief, Equifax has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

106.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in his consumer reports.

107.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify PennyMac of Plaintiff's dispute, by failing to provide PennyMac with all the supporting information/documents included with Plaintiff's dispute, by failing to conduct a reasonable reinvestigation of Plaintiff's dispute, and by failing thereafter to appropriately modify information in Plaintiff's file and on his consumer reports.

108.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

109.   Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

110.   Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### PennyMac Loan Services LLC

111.   Plaintiff incorporates by reference paragraphs 1 through 111 as though fully stated herein.

112.   Pursuant to 15 U.S.C. § 1681s-2(a), PennyMac is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

113.   Upon information and belief, Equifax timely notified PennyMac of Plaintiff's dispute, and provided PennyMac with all the relevant information that Plaintiff had submitted.

114.   Pursuant to 15 U.S.C. § 1681s-2(b), PennyMac had a duty to investigate Plaintiff's dispute and accurately report its findings to Equifax.

115.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

116.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

117.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

118.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), PennyMac was required to review and consider all relevant information submitted by Plaintiff to Equifax.

119.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of reporting the account.

120.   PennyMac breached its duties as described herein.

121.   If PennyMac had conducted a reasonable investigation of Plaintiff's dispute, PennyMac would have reviewed and considered all of the information Plaintiff submitted to Equifax in his dispute, and would have easily detected that

what was being reported regarding the account was factually incorrect, inaccurate, and misleading.

122.   If PennyMac had conducted a reasonable investigation of Plaintiff's dispute, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

123.   Due to PennyMac's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

124.   PennyMac had all the information necessary to correct its reporting. Despite that, PennyMac failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that PennyMac's investigation procedures were not reasonable.

125.   The fact that PennyMac had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that PennyMac recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

126.   PennyMac willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's dispute from Equifax, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

127.   As a result of PennyMac's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from PennyMac under 15 U.S.C. §§ 1681n and 1681o.

128.   PennyMac's actions and omissions were willful, rendering PennyMac liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

129.   Plaintiff is entitled to recover costs and attorneys' fees from PennyMac pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

130.   Plaintiff is entitled to and hereby request a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendants for:

a) Plaintiff's actual damages;

b) Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c) Punitive damages pursuant to 15 U.S.C. § 1681n;

d) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e) Such other and further relief as may be just and proper.

Respectfully submitted this 13th day of May, 2024.

BERRY & ASSOCIATES

*/s/ Matthew T. Berry*
Matthew T. Berry
Georgia Bar No.: 055663
matt@mattberry.com
Telephone: (404) 235-3334
2751 Buford Highway, Suite 600
Atlanta, GA 30324

*/s/ Chris Armor*
Christopher N. Armor
Georgia Bar No. 614061
P.O. Box 509

Londonderry, Vermont 05148
Phone 651-208-6441
Fax 404-592-6102
chris.armor@armorlaw.com

*Counsel for Plaintiff*